**LYKES BROS. S. S. CO., Inc., v. SHEP-PEARD, Deputy Com'r, et al.**

**Civ. A. No. 65.**

District Court, S. D. Texas, Galveston Division.

March 4, 1941.

Royston & Rayzor and M. L. Cook, all of Galveston, Tex., for plaintiff.

Douglas W. McGregor, U. S. Atty., and W. F. Leigh, Asst. U. S. Atty., both of Houston, Tex., for G. Sheppeard, Deputy Commissioner.

KENNERLY, District Judge.

This is a proceeding under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., to review a compensation award and order of a Deputy Commissioner, Section 921, 33 U.S. C.A., entered in the matter of a claim of defendant C. B. Stansfield (for brevity called Stansfield) against Lykes Bros. Steamship Company (for brevity called plaintiff) on February 1, 1941, as a result of a formal hearing held December 11, 1940 (for brevity called second hearing), at which the parties were present. Such award and order purport to have been entered in modification, Section 922, 33 U.S. C.A., of a prior award and order of the Deputy Commissioner entered June 6, 1939, pursuant to an informal hearing (no formal hearing having been requested) held May 19, 1939, with Stansfield present (called for convenience first hearing). This first hearing appears to have continued along informally until June 6, 1939, the date of the award and order. At the first hearing, the Deputy Commissioner appears to have considered the following:

(a) Agreed statement of facts as follows:

"We, the parties hereto, C. B. Stansfield, claimant and Lykes Bros. Steamship Co., Inc., employer agrees that the following are the facts which we submit to the Deputy Commissioner and request him to make an award and issue an order in accordance therewith:

"1. On the 15th day of September, 1938, C. B. Stansfield was in the employ of the Lykes Bros. Steamship Co. Inc., as a longshoreman on the S/S 'Margaret Lykes' which vessel was located at Pier No. 38, at Galveston, Texas.

"2. That on the said date, to-wit: September 15th, 1938, while acting in the course of his employment on board the said Steamship, the claimant was struck on the left shoulder by a sling load of wheat, which caused him to sustain personal injuries; to-wit; upward dislocation of inner end of left clavicle, wide separation.

"3. That notice of such injuries was given to the Deputy Commissioner and to the employer within thirty days thereafter; and that the employer furnished the said claimant the necessary medical treatment.

"4. That on the date he sustained the said injuries C. B. Stansfield was earning $25.00 per week.

"5. That as a result of the injury he sustained on September 15th, 1938, the said C. B. Stansfield was totally disabled from work for a period of thirty-five weeks and one day, or from September 15th, 1938 to May 18th, 1939, inclusive, and he was not paid full wages for the day of injury.

"6. That the said Lykes Bros. Steamship Co., Inc., has paid C. B. Stansfield the sum of $619.17 as compensation for a period of thirty-seven weeks and one day or from September 15th, 1938 to June 1st, 1939, inclusive.

"7. That on account of the injury he sustained on September 15th, 1938, he is to be paid thirty-five weeks and one day compensation for temporary total disability, and

the sum equal to 15 per centum permanent partial disability of his left arm.

"The parties hereto expressly waive a formal hearing and request the Deputy Commissioner to issue a formal compensation order."

(b) Report of Dr. G. W. N. Eggers, dated April 18, 1939, as follows:

"As requested I examined Mr. C. B. Stansfield who, on September 15th, 1938, was jammed by a sling load of wheat against stacked cargo and injured his shoulders. The force caused his shoulders to 'fold' together and 'tore loose' his left collar bone.

"His present complaint is pain in both shoulders and particularly the medial end of the left clavicle. · He claims he cannot lift anything, especially above his shoulders.

"Examination of the right shoulder shows no limitation of abduction, extension of elbow or hand, flexion of the hand and elbow. Elevation of the arm and scapula is normal. There is a complaint of pain when the shoulder is moved. However, there is no evidence of any gross pathology or arthritic involvement more than expected at this age.

"The left shoulder presents the same findings as the right.

"The medial or sternal end of the clavicle is dislocated upward and forward. There is a liberal amount of fiberous tissue about it creating a false joint. The motion is very free without restriction. As the shoulders are brought forward, there is a medial excursion of about one half inch. As this moves he complains of pain.

"Such dislocations cause but little loss in the efficiency of the individual as a worker. However, a certain amount of permanent disability does follow such a dislocation. The amount of permanent partial disability in this case I would recommend is fifteen per cent of the left shoulder. The discomfort due to any bilateral shoulder pain ,is due to arthritis as shown in X-ray and I do not consider it traumatic."

(c) Report of Dr. F. W. Aves, dated May 22, 1939, as follows:

"On May 18th I sent you a short report by Mr. Stansfield stating that I believe that he had reached his maximum degree of improvement.

"This man was injured September 15, 1938, at 8:45 A.M. in the hold of the Margaret Lykes, when a swing load of thirty bags of wheat jammed him against stacks of rice. This swing load of wheat came against his left shoulder, pinning his chest laterally. The result of this was a complete dislocation of the inner end of the left clavicle with wide separation, and of course bruises of both shoulders. This treatment consisted of a Zimmerman brace with reduction of the dislocation by this method. He was kept in this brace one month, and his arm in a sling for another month. On account of the extensive tearing of ligaments at the sight of dislocation, the result is far from perfect. This man's complaints are not severe at the sight of dislocation as one would imagine, but he complains principally of pain in the left shoulder, which is due to a chronic arthritis, which no doubt was made worse by his injury. I had this man examined by Dr. Eggers a little over a month ago, and a copy of his report is in your files dated April 18, 1939.

"According to Mr. Stansfield's statement, he has seen no improvement in his condition during the past six weeks, and by examination, I see no change during that time. I also estimate his degree of permanent disability as 15% of the left shoulder region."

The award and order of June 6, 1939, gave Stansfield total compensation in the sum of $1,285.97, which plaintiff thereafter fully paid. The award and order under review (February 1, 1941) gives Stansfield $466.76 additional.

The Deputy Commissioner's findings of fact upon which the order under review is based are as follows:

"That on the 15th day of September, 1938, C. B. Stansfield was an employee in the service of Lykes Bros. Steamship Company, Inc., at Galveston in the State of Texas in the Eighth Compensation District, established under the provisions of the Longshoremen's and Harbor Workers' Compensation Act; and that on the 15th day of September 1938, the liability of Lykes Bros. Steamship Company, Inc., for compensation and medical benefits was covered by self-insurance as provided in Section 32 of the Longshoremen's and Harbor Workers' Compensation Act.

"That on the 15th day of September, 1938, while employed in the service of Lykes Bros. Steamship Company, Inc., on board the steamship Margaret Lykes, which said vessel was then in the harbor of Galveston in navigable waters of the United States, a sling load of wheat struck C. B. Stansfield on the left shoulder,

which caused him to sustain a personal injury; to-wit, upward dislocation of the inner end of the left clavicle with wide separation.

"That due notice of the injury was given within thirty days to the employer, Lykes Bros. Steamship Company, Inc., and to the Deputy Commissioner.

"That in accordance with Section 7 (a) of the Longshoremen's and Harbor Workers' Compensation Act, the employer, Lykes Bros. Steamship Company, Inc., furnished C. B. Stansfield, claimant, such medical, surgical, and hospital service as the nature of his injury required.

"That as a result of the injury he sustained on the 15th day of September, 1938, C. B. Stansfield was wholly disabled from September 15, 1938, to May 18, 1939, inclusive.

"That on June 6, 1939, after investigation and informal hearing, and relying on the only medical evidence available, it was found that as a result of the injury he sustained on the 15th day of September, 1938, C. B. Stansfield had a permanent partial disability in his left arm at the shoulder equivalent to 15% of such disability as he would have if he had sustained the total loss of use of that member; and thereafter on the same date an award was duly entered whereby the employer was directed to pay to C. B. Stansfield compensation for total disability from September 15, 1938, to May 18, 1939, inclusive, or 35½ weeks at $16.67 a week in the amount of $585.83 and for permanent partial disability in the left arm 42 weeks at $16.67 in the amount of $700.-14; a total of 77½ weeks at $16.67 a week in the sum of $1,285.97.

"That pursuant to the terms of the order and award the employer, Lykes Bros. Steamship Company, Inc., paid to C. B. Stansfield, claimant, the sum of $1,285.97 as compensation at $16.67 a week for the period of 77½ weeks, the last payment being made on the 7th day of March, 1940.

"That as a result of the injury he sustained on the 15th day of September, 1938, on board the steamship Margaret Lykes in the harbor of Galveston, Texas, C. B. Stansfield has a permanent partial disability in that as he lifts his left arm into certain positions; to-wit, at or above the level of his shoulder, the upper dislocated inner end of the left clavicle causes pressure on his trachea, which embarrasses or interferes with his breathing; that on June 6, 1939, the date the award was entered and the compensation order issued this fact was neither developed by either party in interest nor known to the Deputy Commissioner, the evidence presented by the attending physician being that C. B. Stansfield had 15% permanent partial disability affecting only the use of his left arm in the region of the shoulder; that the 15% permanent partial disability found in the left arm on June 6, 1939, is not the extent of the permanent partial disability resulting from the injury he sustained on the 15th day of September 1938; that the pressure of the dislocated left clavicle, which existed at the time but was not known to the Deputy Commissioner, exercised pressure on the trachea and added to the permanent partial disability in the left arm so that the award entered on June 6, 1939, was not adequate; and inasmuch as a greater award would have been entered had the fact of the dislocated clavicle's pressure on the trachea been known, it therefore constitutes a mistake as to the actual facts as to the nature and extent of the permanent partial disability that existed at the time of the award on June 6, 1939.

"That on June 6, 1939, C. B. Stansfield was and subsequent thereto has been permanently partially disabled due to the condition of his left arm resulting from the injury he sustained on September 15, 1938.

"That as a result of the injury he sustained on September 15, 1938, C. B. Stansfield has a 25% permanent partial disability affecting the use of his left arm which includes the disability of the pressure of the dislocated left clavicle upon his trachea when his left arm is elevated to the level of or above his shoulder."

1. Under the Law, Section 922, 33 U.S. C.A., a Deputy Commissioner may modify his awards only: (a) "On the ground of a change in conditions," or (b) "Because of a mistake in a determination of fact by the deputy commissioner."

Although the Deputy Commissioner expressed the view at the second hearing that it was held to determine whether there had been a "change in conditions," he makes no finding that there was, and the evidence is all one way (including the testimony of Stansfield) that there was not. It is not necessary, therefore, to further consider the case from that standpoint.

2. The Deputy Commissioner finds, however, that at the first hearing, he made a mistake in a "determination of fact," in that he did not know at the first hearing

that if and when Stansfield "lifts his left arm into certain positions, to-wit, at or above the level of his shoulder, the upper dislocated inner end of the left clavicle causes pressure on his trachea, which embarrasses or interferes with his breathing."

That because he did not know of such condition, he found only 15% permanent partial disability. But that if he had known of such condition, he would have found greater disability. Learning of such condition at the second hearing, he finds 25% disability, and makes the additional award stated.

While the Deputy Commissioner finds that he did not know of such condition at the first hearing, it is certain that Stansfield then knew of it. I quote a part of his testimony while being examined by the Deputy Commissioner at the second hearing:

"Q. I want you to state briefly what is the nature of your complaint and why you asked to have this case re-opened. A. The reason I asked to have this case re-opened is because I ain't able to do any kind of hard work.

"Q. Tell me about your complaint—how does it affect you? A. I can't do any heavy lifting, I can't lift anything over my head; I have not got no control over that arm any more, it gives way and I have to drop it. In working on the wharf, you have to stack cotton three high and I can't do that kind of work.

"Q. I know that. Answer my question. I asked you how do you complain of your arm and shoulder? Tell me how it affects you. A. It bothers me all the time. Any kind of movement bothers me; if I sleep on that side, it cuts my wind off; if I lift it that high (illustrating) it cuts my wind off.

\* \* \* \* \* \*

"Q. Is that arm in the same condition it was when the award was made? A. Yes, sir.

"Q. It has not changed? A. It has not changed a bit; it is in the same condition. I told Dr. Aves about it—he just beat around the bush—it is the same.

"Q. It is just like it was then—there is no change in your feelings in your arm—is that right or not? A. Yes, sir, that is right."

I quote also conversation at the second hearing between Dr. Aves and Stansfield while Dr. Aves was being questioned:

"Q. Have you examined Mr. Stansfield since April? A. I don't believe I have, no, sir; the last record I have is April, 1940.

"Q. Does that fracture interfere with his breathing? Does it press against his trachea? A. No, sir.

"Q. He complains that it does. Would you mind examining him?

"Stansfield: He knows it does; I have told him a dozen times about that shoulder cutting my wind off. I can't sleep at night. It cuts my wind off.

"Aves: But it does not go anywhere near your wind pipe.

"Stansfield: I have to give way in my shoulder. I have got no strength in it. I have told you that."

Dr. Aves at the second hearing examined Stansfield in the presence of the Deputy Commissioner and testified that such condition had not previously existed and did not then exist, so that it seems clear that if Stansfield made the statements to Dr. Aves he claims he made, Dr. Aves did not agree with him and did not give such statements consideration in forming the opinion that there was a 15% disability as shown by his report of May 22, 1939. There is nothing in the report of Dr. Eggers of April 18, 1939, which indicates that he knew of such condition, and no reference thereto in the agreed statement of facts.

Looking to the entire record, the reasonable conclusion is that although Stansfield knew the facts, he at no time during the entire period that elapsed from the date of his injury (September 15, 1938) until the second hearing (December 11, 1940) informed the Deputy Commissioner of this condition which affects his breathing and which is the basis of the Deputy Commissioner's action in increasing the amount of the award.

I think an employee may not thus withhold the facts from the Deputy Commissioner and be lawfully given a modification of the award under Section 922. It is clear the case comes neither within the letter nor the spirit of Section 922.

Plaintiff may have its decree, enjoining the enforcement of the award and order of February 1, 1941, complained of.